RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0241p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

ALFRED ROSS WINGATE, JR.,

*Petitioner-Appellant*,

*v.*

UNITED STATES OF AMERICA,

*Respondent-Appellee*.

┐
│
│
> No. 18-2381
│
│
┘

───────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
Nos. 2:11-cr-20481-1; 2:17-cv-10612—Arthur J. Tarnow, District Judge.

Argued: May 1, 2020

Decided and Filed: August 5, 2020

Before: BOGGS, GRIFFIN, and LARSEN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Andrew Kim, GOODWIN PROCTER LLP, Washington, D.C., for Appellant. Patricia Gaedeke, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** Andrew Kim, William M. Jay, GOODWIN PROCTER LLP, Washington, D.C., for Appellant. Patricia Gaedeke, Kenneth R. Chadwell, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

───────────────

## OPINION

───────────────

LARSEN, Circuit Judge. Alfred Wingate was charged with multiple counts of federal robbery and firearm crimes in connection with a conspiracy to rob a bank and two pharmacies. After an eight-day jury trial, he was convicted on all counts. This court affirmed his conviction

on direct appeal.  Wingate then filed a § 2255 motion to vacate his sentence, asserting that his counsel was ineffective and that the federal bank robbery and pharmacy robbery statutes are not crimes of violence under 18 U.S.C. § 924(c)'s elements clause.  The district court rejected both claims, and we AFFIRM.

## I.

Alfred Ross Wingate, Jr. was charged with nine counts relating to three robberies:  one count of bank robbery in violation of 18 U.S.C. § 2113(a), two counts of pharmacy robbery in violation of 18 U.S.C. § 2118(a), three counts of using or carrying a firearm during a federal crime of violence in violation of 18 U.S.C. § 924(c), two counts of being a felon in possession of a firearm (Wingate was on parole for second-degree murder at the time of the robberies) in violation of 18 U.S.C. § 922(g), and one count of conspiracy to commit the previously mentioned crimes in violation of 18 U.S.C. § 371.  Nearly all of the indicted co-conspirators pleaded guilty; only Wingate and Raynard Crowe went to trial.  After an eight-day joint trial, the jury convicted Wingate on all nine counts, but acquitted Crowe of the charges related to one of the pharmacy robberies.  The district court sentenced Wingate to a total of 684 months' imprisonment.  Both men appealed, and we affirmed.  *United States v. Crowe*, 614 F. App'x 303, 314 (6th Cir. 2015).

Wingate subsequently filed a § 2255 motion, arguing that his trial counsel was ineffective and that his convictions for bank and pharmacy robbery were improperly classified as crimes of violence under § 924(c).  The district court denied Wingate's § 2255 motion but granted a certificate of appealability on all claims.  Wingate now appeals.

## II.

## A.

We review the denial of a § 2255 motion de novo.  *Rodriguez-Penton v. United States*, 905 F.3d 481, 486 (6th Cir. 2018).  That same de novo standard also applies to "claim[s] of ineffective assistance of counsel, which [are] mixed question[s] of law and fact."  *Id.*  We review

the district court's factual findings for clear error. *McPhearson v. United States*, 675 F.3d 553, 558 (6th Cir. 2012).

To prevail on an ineffective-assistance-of-counsel claim, Wingate must satisfy the two-pronged test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). First, Wingate "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. Second, he must show prejudice, that is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" is one "sufficient to undermine confidence in the outcome." *Id.*

We may address *Strickland*'s prongs in any order, and we need not address both prongs "if [Wingate] makes an insufficient showing on one." *Id.* at 697. Here, Wingate argues that trial counsel was ineffective for failing to cross-examine more of the government's witnesses and for "failing to move to suppress the identification obtained as a result of a suggestive photo lineup." Wingate cannot demonstrate prejudice, so we do not address the performance prong.

B.

Wingate was convicted of robbing three institutions: a Citizens Bank branch, the Ferndale Pharmacy, and a Medicap Pharmacy. He claims that his trial counsel provided him with ineffective assistance on each count. We organize our analysis by robbery.

*The Citizens Bank Robbery*. Wingate's trial counsel cross-examined six of the government's nine witnesses with respect to this robbery. Wingate argues that he was prejudiced by counsel's failure to cross-examine the other three. In particular, he complains that he was harmed by his counsel's failure to ask them whether Wingate was "present at the scene of the crime or not seen by [them] at the scene." We see no prejudice.

At trial, the government showed the jury various videos pulled from the bank's security cameras. One video, taken from the bank's ATM camera, showed a "maroon" or "burgundy" minivan pulling up in front of the bank. Shurita Kennedy and Leroy Loving, two co-conspirators

turned government witnesses, identified the minivan as Wingate's. The bank's security footage also showed two unmasked men getting out of the minivan and entering the bank. When shown a still frame from the video, Loving identified himself as one of the men and Wingate as the other.

Mary Long and Carol Thompson were the only two bank employees at the branch that day. Long and Thompson testified that once the two men were inside the bank, they lowered their masks to cover their faces and robbed the bank at gun point. Because of the masks, neither Long nor Thompson was able to identify the robbers beyond noting that they were both black and male. The jury was shown the bank's security video that confirmed Long's and Thompson's accounts.

While the robbery was going on, the ATM camera outside the bank recorded the arrival of parking enforcement officer, Jeanne Brys. Brys testified that she stopped to ticket the minivan, whose meter had expired. But upon seeing the minivan's handicap license plate, she declined to ticket it. She described the minivan as "maroon," "in mint condition," and "newer [with] tinted windows." Brys testified that "someone exited the bank . . . and walked in front of [her] vehicle with a backpack and they were wearing a rubber glove." She said when she saw the man, she "froze for a moment," "locked [her] door," and "looked straight ahead," avoiding eye contact. She indicated that she felt unsafe because the "situation seemed suspicious," and she was wearing what looked like a police uniform but was not armed. Brys's testimony is consistent with Loving's that Wingate alone returned to the minivan.

Two other witnesses testified about the bank robbery. The first was Wingate's fiancée, Nancy Brown, who acknowledged that she would not have testified had she not been subpoenaed. She identified the minivan as hers, describing it, as had Brys, as a "nice," "burgundy," "2009 Honda Odyssey" with a handicap license plate. She further testified that Wingate had "free use" of the vehicle. She confirmed that she had deposited $3,000 in cash into her bank account just three days after the robbery. Wingate gave her that cash.

The other witness was a local police officer, Patrick Spelman. Spelman pulled Crowe over the day after the robbery and smelled marijuana in the vehicle; a search uncovered "a little more than" a gram of marijuana on Crowe and $1,543 in cash. Spelman interrogated Crowe on suspicion of being a marijuana dealer, but he ultimately released Crowe without charges.

Of these nine witnesses, the only three whom Wingate's trial counsel did not cross-examine were Spelman, Thompson, and Brys. No amount of cross-examining Spelman could have improved Wingate's case. Spelman had no interaction with Wingate at any time and could not have testified to whether Wingate was at "the scene of the crime," as Spelman was never there himself.

Thompson and Brys are alleged, at least by implication, to have had contact with Wingate. But no meaningful benefit could have been derived from cross-examining them about their inability to place Wingate at the scene of the crime. Their direct testimony already revealed that they could describe the robbers in only the most superficial fashion. The only identifying information Thompson could manage was that the masked robbers were "a different size" than Crowe. And Brys testified that she never looked directly at the man who walked in front of her car; she saw him out of the corner of her eye and could describe him only as a "black male," wearing a backpack and a rubber glove. It is not surprising, then, that the government did not rely on their identification.

The jury watched the bank's security footage that, along with other corroborating testimony, already placed Wingate and his minivan at the bank during the robbery. Considering "the totality of the evidence before the . . . jury," *United States v. Dado*, 759 F.3d 550, 563 (6th Cir. 2014) (quoting *Strickland*, 466 U.S. at 695), even a rigorous cross-examination of these witnesses could not have created the likelihood of acquittal necessary to undermine confidence in the jury's verdict, *see Strickland*, 466 U.S. at 693–94. Wingate was not prejudiced by his counsel's failure to cross-examine Spelman, Thompson, and Brys.

*The Ferndale Robbery*. Wingate makes the same argument—trial counsel provided ineffective assistance by failing to cross-examine more of the government's witnesses—about the robbery of the Ferndale Pharmacy. Again, we are unpersuaded.

The government presented the following case: Aubry Allen, Crowe's cousin and a co-conspirator, testified that Crowe planned the robbery and recruited him, first as a getaway driver and then as one of the gunmen. Allen further testified that he, Wingate, and Wingate's son, Christian Reid, arrived at the Ferndale Pharmacy in Wingate's minivan. Reid testified that Wingate and Allen entered the pharmacy armed to carry out the robbery. And according to Allen, Allen entered the pharmacy first, without a mask, and Wingate followed wearing a mask. Reid remained in the car as the getaway driver.

Sarah Misho, a pharmacy technician working in the Ferndale Pharmacy during the robbery, testified that she looked up from where she was working in the back and saw a man "standing near the entranceway with a gun," pointing it at one of the pharmacy's interns or another employee. "As soon as [she] saw him, [she] grabbed [her] cell phone and dialed 911," and then left the phone in her pocket. She said the robbers led everyone into a room and put them on the floor with their hands tied behind their backs. Chandra Chittiprolu, the pharmacy manager, was also tied up in that room. When the robbery started, he said he saw two men come in "like . . . customers," but the men then rushed forward, shouting and pointing their guns. He said he could not identify or describe the robbers because "they wore masks."

While the robbery was on-going, Misho's phone call to 911 was getting results. Robert McDonald, a dispatcher for the Ferndale police answered and recorded the call. He testified that he heard "a male voice telling people to get on the ground" and "what [he] thought was a female . . . crying." He traced the call and dispatched officers to the Ferndale Pharmacy. Brown, Wingate's fiancée, testified that the male voice on the recording was Wingate's.

Officers began arriving at the scene en masse. Officer Daniel Kuzdzal positioned himself where he could watch the back door and saw two people exit, "an older male . . . [and] a younger male." He gave chase and the younger male—later identified as Allen—"eventually cooperated and laid [sic] down." Kuzdzal took him into custody.

Another officer, Jason Collett, pulled up in front of the pharmacy and exited his car. He noticed a minivan backed into a parking space with the engine running. He approached the van and ordered the driver—Reid—to show his hands. Reid "immediately put the vehicle in drive and fled."

Collett then learned that two suspects "were exiting the rear of the pharmacy." So he went around back and arrived in time to "assist[] Officer Kuzdzal with detaining Mr. Allen." He then pursued the other suspect on foot. With the help of a canine unit, Collett located the suspect under "some bushes" about a block from the pharmacy. In the courtroom, Collett identified that suspect as Wingate.

After Reid took off in the van, he was chased by Officer Stephen Carroll until he crashed the van about a mile from the pharmacy. Reid then fled on foot but was discovered hiding in a garbage can and apprehended. The minivan was later impounded and identified by its owner, Brown—Wingate's fiancée—who testified that Wingate "had possession of that van . . . before it was destroyed"; officers also discovered Wingate's photo ID in the minivan.

Two other police officers testified: Brandon Willey and Paul Simpson. Willey primarily testified that he recovered the black bag used in the robbery near the backdoor where Allen and Wingate had exited the pharmacy. The bag contained drugs and a gun. Simpson testified to photographing the crime scene and recovering a mask.

Of the government's eleven witnesses, Wingate's trial counsel cross-examined two—Allen and Brown. But it is unclear what advantage Wingate would have gained from questioning the other nine. Reid (who is Wingate's son) and Collett both testified that Wingate was at the scene of the crime and identified him in the courtroom, so asking them whether Wingate had been present at the scene would only have caused them to confirm their testimony. Although Wingate offers no other line of rebuttal or impeachment questioning for Collett, he argues that his counsel could have impeached Reid's testimony by pointing out that Reid "agreed to a plea deal in exchange for testifying against his father," was "somewhat estranged" from him, and "blamed [him] for his lot in life after the Ferndale Pharmacy Robbery." But Reid had already acknowledged that he had taken a plea deal and entered into a cooperation

agreement. And the basis for blaming Wingate for his "lot in life" after the robbery was Reid's testimony that Wingate had abused his trust by recruiting him; if Reid's anger had seemed sincere (as it would have needed to for his anger to have effectively impeached him), it would only have served to verify Reid's recruitment story.

As to Willey, Simpson, Carroll, and McDonald, none testified to ever seeing Allen or Wingate. Although Willey's car-cam recorded the robbers exiting the pharmacy, he was in the front of the pharmacy at the time and was not "involved in the[ir] pursuit." Simpson arrived at the crime scene after the arrests had already been made to take photographs and begin his investigation. Carroll testified only to his pursuit of Reid. And McDonald testified only to the audio of the 911 call; he was never anywhere near the pharmacy. Asking any of them if they had ever seen Wingate before would have been pointless as they had never given any indication that they had.

The only witnesses who testified to having seen the robbers but who did not identify Wingate were Kuzdzal, Misho, and Chittiprolu. There may have been some benefit to having these witnesses confirm that, despite interacting with the robbers, they could not definitively say that Wingate was one of them. But even if they did so testify on cross-examination (and did not instead testify that Wingate's body type was consistent with one of the robbers or the like), this would not have undermined confidence in the jury's verdict. *See Strickland*, 466 U.S. at 693–94. Wingate was apprehended near the scene of the crime, his minivan was followed from the scene and seized by the police, and Wingate's fiancée, who did not have a plea or cooperation agreement with the government, identified both the van as hers and the male robber's voice on the 911 call as Wingate's. Considering the totality of the evidence presented to the jury, *Dado*, 759 F.3d at 563, additional cross-examination would not have created a reasonable probability of a different outcome, *see Strickland*, 466 U.S. at 693–95. This is demonstrated by a real-life counterfactual: Crowe's counsel *did* cross-examine Kuzdzal, Misho, and Chittiprolu in the way Wingate now suggests. Crowe's case was less burdened with incriminating evidence. For example, Crowe was not chased from the scene and arrested, and his identification was not discovered in the minivan. Yet the jury still convicted Crowe. Wingate was not prejudiced by his counsel's failure to further cross-examine the Ferndale robbery witnesses.

*The Medicap Robbery.* Wingate makes the same cross-examination argument about the Medicap robbery, and as with the other robberies, it is weak. He also faults his counsel for failing to move to suppress a pre-trial photo lineup and the in-court identification based on it.

As to the Medicap robbery, Loving testified that he entered the pharmacy first to distract the employees while Wingate entered behind him to lower the pharmacy's security gate. Both men were carrying guns. Heather Cavitt, a pharmacy technician, said that a man came in and asked about a prescription; while she was looking it up, she heard the security gate close and looked up because it was not closing time. She said that she got a "good look" at the unmasked man who closed the gate before the first man pulled on a mask and drew a gun. She was then ordered to lie down on the ground, but she reiterated that she saw both men before she complied. At trial, she identified the second man as Wingate.

On cross-examination, Wingate's trial counsel questioned Cavitt about her police statement, which neither included any description of the men nor said that she had gotten a good look at them. He also asked about the speed of the events. Cavitt acknowledged that everything had happened quickly but stood by her initial testimony, explaining that the gate "brought [her] attention" and she "saw the gate going down and saw the gentleman putting it down."

Cavitt's fellow pharmacy technician, Taylor Gielow, testified that, after Cavitt was on the floor, the robbers—two black men with guns, the first with a mask but the second without—were "[y]elling and demanding" that the safe be opened and emptied into a "large black bag"; a pharmacist complied. The second man, with his hand on Gielow's shoulder and a gun in her back, had her open the cash register and empty it into the bag. On cross-examination, Gielow acknowledged that in her police statement she said that one of the robbers looked like Rick Ross, a rapper. The robbers then fled out the back door, and the pharmacist called the police.

Loving testified that when he and Wingate came out the backdoor, Applereshia Bell, who was supposed to be waiting for Wingate, was nowhere to be seen. Wingate took off, literally leaving Loving holding the bag. Loving pressed on; he went over a wall into a residential backyard and headed toward the street where Desmond Rogers was supposed to be waiting. But a woman began chasing after him, screaming. That woman was Lisa Guy. It was her yard

Loving had passed through, and when she saw him coming out of her backyard with what looked like a heavy bag, she assumed Loving had stolen tools from her open garage. So she gave chase, screaming and making a ruckus "the whole time."

As she chased him out into the road, a white pickup truck with three black men in the front seat (Loving said it was just Rogers and Crowe) drove toward them. When Crowe's attorney cross-examined Guy about the men in the car, she said that she "didn't get a real good look at their faces" and could not definitively identify Crowe as one of the men. The truck slowed down as it approached them, and Loving tried to throw the bag into the back but missed; the truck then sped off. Loving tried to catch the truck but could not keep up. When Guy told Loving that she had called the police, he left the bag and ran. Guy took the bag back to her house. Loving meanwhile began stripping off his outer clothing and ran to a local diner where he tried to call Kennedy and Crowe. Neither answered, and the police eventually apprehended him.

Two more witnesses were called, both were law-enforcement officials. Ronald Visbara, a Michigan police officer and crime-scene investigator, testified that he took photos of the crime scene and discovered much of Loving's discarded clothing. James Booms, a local police officer and evidence technician, recovered the duffle bag, which contained drugs, money, and guns.

Wingate's trial counsel cross-examined each witness except Visbara and Guy. Visbara arrived at the crime scene after the robbery was over; he could not have meaningfully testified that he did not see Wingate at the scene. Guy, on the other hand, testified to seeing three black men in the pickup truck that Loving was trying to get into. Any benefit to asking her to verify that she could not identify Wingate as one of three men in the truck would have been slight—she had already testified that she did not get a good look at the men's faces. Wingate argues that his attorney's failure to cross-examine Guy nevertheless prejudiced him because Crowe's trial counsel did cross-examine her, and he was acquitted of this robbery. We are not convinced, however, that Crowe's acquittal had as much to do with cross-examining Guy as it did with the absence of direct testimony like Cavitt's, which placed Wingate at the scene. So long as Cavitt's testimony remains in evidence, trial counsel's failure to cross-examine Guy cannot create a reasonable probability of a different outcome. *See Dado*, 759 F.3d at 563.

Wingate argues, however, that Cavitt's testimony should not and would not have been considered if his trial counsel had objected to a suggestive pre-trial photo lineup and the in-court identification based on it.  "To determine whether an allegedly suggestive pre-trial identification casts an impermissible taint on a later in-court identification, a court utilizes a two-step evaluation.  First, the court determines whether the procedure was unduly suggestive." *Mills v. Cason*, 572 F.3d 246, 251 (6th Cir. 2009) (internal citation omitted).  If the procedure was unduly suggestive, the court then weighs five factors "to determine whether the identification was nevertheless reliable."  *Id.* (quoting *Ledbetter v. Edwards*, 35 F.3d 1062, 1071 (6th Cir. 1994)).  We need not proceed past the first step.

For a pre-trial identification procedure to be "'impermissibly suggestive,' the procedure must 'give rise to a very substantial likelihood of irreparable misidentification.'" *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2559 (2018) (quoting *Neil v. Biggers*, 409 U.S. 188, 197 (1972)).  Wingate argues that such a substantial likelihood exists here because "Cavitt's identification was unduly influenced by the lingering notion that the unmasked perpetrator she saw during the Medicap Pharmacy Robbery looked like the rapper Rick Ross."  Wingate's theory goes something like this:  In her police statement, Gielow described one of the robbers as looking like Rick Ross.  Cavitt's statement, on the other hand, gave no description; Wingate supposes this was because everything was moving so fast that she did not get a good look at Wingate.  But, Wingate continues, Gielow and Cavitt were "best friend[s]" and so Cavitt "probably" spoke with Gielow about the robbery and got the idea that one of the perpetrators looked like Rick Ross from her.  So, when the police approached Cavitt with a photo lineup eleven days after the robbery, Cavitt was able to quickly identify the "Rick Ross lookalike."

Unfortunately for Wingate, this theory finds little support in the record.  It is true that Gielow and Cavitt testified to being best friends, who spoke every time they "saw each other at work."  But after the robbery, Gielow "didn't work [at the pharmacy] any longer," so Cavitt "didn't see her" anymore.  When asked if she might have spoken with Gielow about the robbery prior to the photo lineup, Cavitt responded, "[i]t's possible," but that she "didn't really communicate with [Gielow] . . . too quickly after[]" the robbery.  Nothing in Gielow's testimony contradicts Cavitt's testimony on this point.  In short, there is no evidence in the record that

Gielow ever told Cavitt that she thought one of the robbers looked like Rick Ross. Instead, the record contains Cavitt's repeated testimony that she got a good look at Wingate.

Without any evidence that Gielow's description influenced Cavitt's pre-trial identification, the photo lineup does not look impermissibly suggestive. As the district court explained, "[t]hough Mr. Wingate's beard was the biggest of the six men shown, at least four of the five fillers wore beards. With one exception, they all had similar skin tone, they were all bald, and they all appeared around the same age." There is nothing to indicate that the photo lineup would give rise to a "very substantial likelihood of irreparable misidentification." *Sexton*, 138 S. Ct. at 2559 (citation omitted). Furthermore, Wingate's theory of the case would require us to accept Wingate's baseless assertion that the "police were aware of Ms. Gielow's characterization of the unmasked suspect as a 'Rick Ross' lookalike, and they composed the lineup in a way that highlighted only one person as such a lookalike: Mr. Wingate." But there is no evidence to support this claim. On the record before us, it seems far more plausible that it took Cavitt "less than a minute" to pick Wingate out of the lineup because she did indeed get a good look at him during the robbery than that she simply picked the lone "Rick Ross lookalike" the police allegedly planted there.

Cavitt's in-court identification of Wingate was not based on an unduly suggestive photo lineup. Wingate's counsel's failure to object to either identification was not ineffective assistance under *Strickland*. *See Strickland*, 466 U.S. at 694.

We therefore affirm the district court's denial of Wingate's ineffective assistance of counsel claims.

## III.

### A.

We turn next to Wingate's claim that his convictions for bank and pharmacy robbery were improperly classified as crimes of violence under 18 U.S.C. § 924(c). But first, we address a threshold issue. At oral argument, the panel requested supplemental briefing on whether Wingate's certificate of appealability (COA) for his crime-of-violence claim was improvidently

granted. There is "no right of appeal" from a district court's "final order in a proceeding under section 2255." 28 U.S.C. § 2253(b), (c). Instead, a prisoner must first obtain a COA. *Id.* § 2253(c). Although the district court may consider a statutory claim raised in a § 2255 motion, the statute does not authorize granting a COA on such claims. *Compare* 28 U.S.C. § 2255(a) (authorizing prisoners to collaterally attack their sentences "upon the ground that the sentence was imposed in violation of the Constitution *or laws* of the United States" (emphasis added)), *with id.* § 2253(c)(2) (permitting a grant of a COA only where the § 2255 petitioner "has made a substantial showing of the denial of a *constitutional* right" (emphasis added)). The government takes the position that Wingate's crime-of-violence claim is a statutory claim—he merely argues that 18 U.S.C. §§ 2113(a) and 2118(a) do not meet 18 U.S.C. § 924(c)(3)(A)'s definition of a "crime of violence." Wingate, by contrast, argues that he "has made 'a substantial showing of the denial of a constitutional right' for *all* of his claims, including his challenge to his § 924(c) convictions." Building his argument on *Bousley v. United States,* 523 U.S. 614 (1998), he argues that "[t]he correct interpretation of the statutory elements of a crime raises a [due process] issue . . . where the correct interpretation determines whether the Government's evidence was sufficient."

The government's briefing does not engage Wingate's due-process point. We need not do so either because the Supreme Court has held that § 2253(c)(2), while "mandatory," is "nonjurisdictional." *Gonzalez v. Thaler*, 565 U.S. 134, 143–48 (2012). Accordingly, "if a party timely raises the COA's failure to indicate a constitutional issue," we may "address the defect," but we are not "dutybound to revisit the threshold showing" each time we consider a post-conviction appeal. *Id.* at 143, 146.[1]

Here, the government not only fails to argue that we should exercise our discretion to reach the unraised COA argument, it urges us to decide the case on the merits. Accordingly, as Wingate points out, the government has waived any argument based on the validity of the COA.

---

[1]Before *Thaler*, the circuits had split over whether courts could exercise supplemental jurisdiction to grant a COA on a statutory claim that accompanies a constitutional claim. *Compare Beyer v. Litscher*, 306 F.3d 504, 505–06 (7th Cir. 2002) (concluding that federal courts may employ supplemental jurisdiction to hear statutory claims), *with Marshall v. Hendricks*, 307 F.3d 36, 80–81 (3d Cir. 2002) (concluding that exercising supplemental jurisdiction to address statutory issues on appeal is inconsistent with "the plain language" of § 2253). After *Thaler,* there is no longer a jurisdictional question.

*See Wood v. Milyard*, 566 U.S. 463, 474 (2012). We, therefore, proceed to the merits of Wingate's § 924 (c) claim, which we review de novo. *Manners v. United States*, 947 F.3d 377, 379 (6th Cir. 2020).

Under 18 U.S.C. § 924(c), "any person who, during and in relation to any crime of violence . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm," is subject to an additional minimum sentence, ranging from five to thirty years. A "crime of violence" is defined, as relevant here, as any felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A). The Supreme Court has defined "physical force" as "violent force—that is, force capable of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010); *see also United States v. Rafidi*, 829 F.3d 437, 445–46 (6th Cir. 2016) (applying *Johnson*'s definition of "physical force" from the Armed Career Criminal Act to § 924(c)(3)(A)). We refer to § 924(c)(3)(A) as the "elements clause." *Manners*, 947 F.3d at 379.

To determine whether an offense of conviction satisfies the elements clause and thus qualifies for the additional punishment imposed by § 924(c), we use the categorical approach. *Id.* That is, we "focus[ ] on the statutory definition of the offense, rather than the manner in which an offender may have violated the statute in a particular circumstance." *Id.* (alteration in original) (quoting *United States v. Denson*, 728 F.3d 603, 607 (6th Cir. 2013)). We "focus on the minimum conduct criminalized" by the statute, while resisting the impulse to "apply 'legal imagination'" to the offense. *Moncrieffe v. Holder*, 569 U.S. 184, 191 (2013) (quoting *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007)). We must determine whether the minimum criminalized conduct necessarily involves physical force as contemplated in § 924(c)(3)(A). *Id.* (quoting *Duenas-Alvarez*, 549 U.S. at 193).

B.

Wingate was convicted of violating the federal bank-robbery statute (18 U.S.C. § 2113) and the federal pharmacy-robbery statute (18 U.S.C. § 2118). The bank-robbery statute states:

> Whoever, by force and violence, or by intimidation, takes, or attempts to take . . . any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank . . . [s]hall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 2113(a). The pharmacy-robbery statute uses similar language:

> Whoever takes or attempts to take from the person or presence of another by force or violence or by intimidation any material or compound containing any quantity of a controlled substance belonging to or in the care, custody, control, or possession of a person registered with the Drug Enforcement Administration[, i.e., pharmacies,] shall . . . be fined under this title or imprisoned not more than twenty years, or both . . . .

18 U.S.C. § 2118(a).

Wingate argues that these statutes do not qualify as crimes of violence under the elements clause because the minimum conduct criminalized is robbery by intimidation, and intimidation "does not necessarily require a forceful or violent act." But a statute that has as an element even the *threatened* use of physical force, satisfies the elements clause. *See* 18 U.S.C. § 924(c)(3)(A). Indeed, as Wingate acknowledges, we have already rejected the "contention that daylight can be found between 'intimidation' and 'threatened use of physical force'" and have held that intimidation under the bank robbery statute "involves the threat to use physical force." *United States v. McBride*, 826 F.3d 293, 296 (6th Cir. 2016).

In *McBride*, we analyzed § 2113(a) under the Sentencing Guidelines' elements clause, but the relevant language is identical to § 924(c)(3)'s elements clause. *Id.* at 295–96; *compare* U.S.S.G. § 4B1.2(a)(1), *with* 18 U.S.C. § 924(c)(3)(A). Accordingly, a panel of this court has already applied *McBride* to the elements clause in § 924(c). *United States v. Henry*, 722 F. App'x 496, 500 (6th Cir. 2018). We have also extended *McBride* to § 924(c)'s elements clause for the federal carjacking statute "[b]ecause the federal bank robbery and carjacking statutes use identical language." *United States v. Jackson*, 918 F.3d 467, 486 (6th Cir. 2019). *McBride* is not

distinguishable, and it seems that Wingate agrees. He challenges the crime-of-violence status of the bank-robbery statute only to "preserve[] th[at] argument for further review."

Wingate does try, however, to distinguish *McBride* and the bank-robbery statute from the pharmacy-robbery statute. He first points to differences in their language. The bank-robbery statute prohibits taking property "by force *and* violence, or by intimidation," while the pharmacy-robbery statute prohibits taking property "by force *or* violence or by intimidation." *Compare* 18 U.S.C. § 2113(a), *with* 18 U.S.C. § 2118(a) (emphases added). But Wingate fails to explain why this slight difference in the force/violence phrases of the two statutes would have any bearing on the meaning of "intimidation," which appears in both statutes. We can see no reason here to distinguish *McBride*.

Wingate's final argument is that the types of intimidation that have "historically occurred in the bank robbery context," performed by "John Dillinger-like bandits," "carry with them an implicit threat: if the money is not produced, harm to the teller or other bank employee may result." Appellant Br. at 45–46 (quoting *United States v. Gilmore*, 282 F.3d 398, 402 (6th Cir. 2002)). But, Wingate continues, "the history of pharmacy robbery" does not suggest that "the type of intimidation needed to conduct a pharmacy robbery must be forceful." "[T]he pharmacy robbery statute . . . was written," Wingate concludes, "in a way that covers both gun-toting robbers and erratic junkies alike," and "because the kind of intimidation that a junkie creates is not necessarily the fear that the junkie will use physical force against another person," pharmacy robbery is not a crime of violence under the elements clause.

It is unclear what history of pharmacy robbery Wingate is working from. But even if Wingate were right that pharmacy robbers intimidate through erratic behavior, why would that not amount to a "threat" that physical force would be used against pharmacy employees or their property? *See* 18 U.S.C. § 924(c)(3)(A) (defining a crime of violence to included threats of physical force against property as well as persons). But more damning is that none of this history is included in the elements of the statute. The question before us is whether the elements of the bank-robbery statute differ from the pharmacy-robbery statute such that *McBride*'s equating of "'intimidation' and 'threatened use of physical force'" does not govern. 826 F.3d at 296. The answer to that question is "no."

Under *McBride*, the district court was right to conclude that §§ 2113(a) and 2118(a) are crimes of violence under § 924(c)'s elements clause.

* * *

For the reasons stated, we AFFIRM the district court's denial of Wingate's § 2255 petition.