RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0261p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

─────────────────

MICHAEL TAYLOR GARDNER,

          *Petitioner-Appellant*,

    *v.*

UNITED STATES OF AMERICA,

          *Respondent-Appellee*.

No. 23-1388

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
Nos. 2:16-cr-20135-1; 2:19-cv-12088—Gershwin A. Drain, District Judge.

Argued:  October 29, 2024

Decided and Filed:  November 25, 2024

Before:  MOORE, COLE, and LARSEN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Katherine Clawson, CASE WESTERN RESERVE UNIVERSITY, Cleveland, Ohio, for Appellant.  Nhan Ho, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.  **ON BRIEF:**  Kelsey Moore, Kayla Tharp, Andrew S. Pollis, Melissa A. Ghrist, CASE WESTERN RESERVE UNIVERSITY, Cleveland, Ohio, for Appellant.  Nhan Ho, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

─────────────────

## OPINION

─────────────────

LARSEN, Circuit Judge.  Michael Gardner prostituted his 17-year-old girlfriend and recorded himself having sex with her.  A jury convicted Gardner of sex trafficking a minor in violation of 18 U.S.C. § 1591(a)(1) and (b)(1), and production of child pornography, in violation of 18 U.S.C. § 2251(a) and (e).  The court sentenced him to 240 months' imprisonment.  Gardner

unsuccessfully appealed his conviction. He then sought habeas relief under 28 U.S.C. § 2255. The district court denied his petition, but granted a certificate of appealability as to: (1) whether Gardner's trial counsel was ineffective for failing to introduce the minor victim's prior advertisements for sex work as exculpatory or impeachment evidence and (2) whether Gardner is entitled to an evidentiary hearing. For the reasons that follow, we AFFIRM.

## I.

Michael Gardner met B.H., the victim, while the two were in high school. Gardner was a senior, and B.H., a freshman. When Gardner moved away that same year, the two lost touch.

A few years later, on August 13, 2015, a Backpage.com account for B.H. was created using B.H.'s email address. Backpage, now defunct, was a classified ads website that was often used in prostitution. From mid to late August, multiple ads were posted from this account, advertising B.H. for prostitution. These ads listed B.H.'s cell phone as the sole contact number.

Later that month, on August 27, 2015, Gardner and B.H. reconnected through Facebook. They started dating soon after, and Gardner recorded a video of himself having sex with B.H. B.H. was seventeen at the time, and Gardner knew it.

On August 28, the day after B.H. and Gardner reconnected on Facebook, Gardner sent a text to B.H. asking, "How much money can I get from you?" R. 107 Trial Tr., PageID 1777. B.H. testified that Gardner eventually became involved in trafficking her for money, though it's unclear just when. What we do know from the trial record is that, at some point after August 28, Backpage ads advertising B.H. for prostitution listed Gardner's phone number along with B.H.'s. We also know that by October 6, Gardner was accessing Backpage from his phone. And by October 8, the ads promoting B.H. for prostitution listed Gardner's phone number as the sole contact.[1]

---

[1]At trial, Gardner claimed that his phone activity and the use of his phone number proved nothing about his responsibility for the ads. That's because B.H.'s phone was lost (or stolen) at the time, and Gardner was loaning his phone to her. But the government provided ample evidence of Gardner using his phone during the period when B.H. was allegedly borrowing it.

The Backpage ads aside, substantial evidence demonstrated Gardner's involvement in prostituting B.H. According to B.H., Gardner would respond to text messages from customers, though sometimes B.H. would as well. When a customer called to discuss details, B.H. testified that Gardner would have B.H. take the call "because dates don't like when females have . . . a pimp" or a guy "in control of what she's doing." R. 106 Trial Tr., PageID 1398. But Gardner would have B.H. put the call on speaker so he could hear the price. And when each encounter was over, Gardner would keep the money. Gardner also coordinated transportation for B.H. to get to her dates and supplied her with drugs to make it through them.

Gardner's supervision of B.H.'s prostitution did not stop there. While she was with a client, B.H. would send updates to Gardner. For example, one text exchange reveals B.H. asking Gardner about a particular sex act a client wished her to perform; Gardner told her to "do it," and then inquired, "How much he paying again?" R. 105 Trial Tr., PageID 1176–77. B.H. would also let Gardner know when a client had left so he could join her in the hotel room. By October, she and Gardner were living in hotel rooms used for and funded by B.H.'s prostitution.

At times, Gardner pressured B.H. to go on dates. If she refused, he would get angry and would "put his hands around [B.H.'s] throat" and warn that "he could hurt [her] really bad" and "get away with it." R. 106 Trial Tr., PageID 1375–76. Fearing Gardner's punishment, B.H. would keep quiet and go on dates, even on days when she was not up for it.

On October 10, 2015, the whole business came to an end. B.H. had a "date" scheduled that evening at the Red Roof Inn. Gardner offered his cousin $30 to drive B.H. to the hotel. Gardner and two others rode along. When they dropped off B.H., Gardner gave her his phone. The group then drove to the hotel across the street, and Gardner told B.H. where they were.

Unbeknownst to Gardner and B.H., the "date" that evening was with an undercover agent. After B.H. and the agent agreed on a price for a sex act, police entered the hotel room. Gardner immediately sent a string of agitated texts to B.H. from his friend's phone. "Call me now," he demanded; "What's going on?" he asked; "Answer my f—ing phone now," he insisted. R. 105 Trial Tr., PageID 1220. B.H. did not see or respond to his texts. Instead, she answered some questions from the police, and they took her to the station. Police then apprehended and

detained Gardner and his companions at the hotel across the street.  They brought Gardner to the police station but released him, and B.H., later that evening.

The next day, B.H. and Gardner went to Kentucky to stay with Gardner's mother.  The two quickly began having arguments, during which Gardner became physically violent.  B.H. decided to leave.  Her departure from Kentucky marked the end of her relationship with Gardner.

A grand jury indicted Gardner on two counts:  (1) sex trafficking a minor in violation of 18 U.S.C. § 1591(a)(1) and (b)(1); and (2) production of child pornography, in violation of 18 U.S.C. § 2251(a) and (e).  A jury convicted Gardner on both counts.  With respect to the sex trafficking count, the jury found both that Gardner knew that B.H. was a minor and that he had used "force, threats of force, fraud, coercion[,] . . . or any combination of such means" to "cause [her] to engage in a commercial sex act."  18 U.S.C. § 1591(a).

After an unsuccessful direct appeal, Gardner filed a motion to vacate his sentence pursuant to 28 U.S.C. § 2255.  The district court denied the motion, but it granted Gardner a certificate of appealability on two claims:  (1) whether Gardner's trial counsel was ineffective for not introducing into evidence advertisements for B.H.'s sex work created before Gardner and B.H. reconnected and using those ads to impeach B.H.; and (2) whether he is entitled to an evidentiary hearing.  Gardner now appeals.

II.

A.

"We review the denial of a § 2255 motion de novo."  *Wingate v. United States*, 969 F.3d 251, 255 (6th Cir. 2020).  This holds true for ineffective assistance of counsel claims, though they involve "mixed question[s] of law and fact."  *Rodriguez-Penton v. United States*, 905 F.3d 481, 486 (6th Cir. 2018).

Criminal defendants have a constitutional right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  This right is violated if two conditions are met:  (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defendant.  *Id.* at 687.  To demonstrate deficient performance, the petitioner must show that

counsel's errors were "so serious that counsel was not functioning as the 'counsel'" the Sixth Amendment guarantees. *Id.* To show prejudice, the petitioner must demonstrate a "reasonable probability" of a different trial outcome in the absence of counsel's errors. *Id.* at 694. At both steps, *Strickland* sets a "high bar," and "[s]urmounting [it] is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

Gardner believes his counsel performed inadequately by failing to introduce into evidence ads placed on Backpage.com after August 13, when a Backpage account was created for B.H., but before August 27, when Gardner and B.H. reconnected. We will refer to these as the "August Backpage ads." Gardner lays out two ways in which this omission harmed him. First, Gardner claims that introducing the August Backpage ads would have "negated" the causation element of 18 U.S.C. § 1591(a). Appellant Br. at 27. Second, Gardner says trial counsel could have used these ads to impeach B.H., whose testimony was critical to the Government's case.

1.

We start with trial counsel's failure to introduce the August Backpage advertisements as "exculpatory" evidence. Appellant Br. at 27. These ads for prostitution were posted using the Backpage account created on August 13 and linked to B.H.'s email address. The ads generally listed B.H.'s phone number as the contact. Gardner says these ads prove that B.H. "was solely responsible for her own sex-work advertisements." *Id.* Had these ads been introduced into evidence, Gardner argues, they would have negated the causation element of § 1591(a) by showing that Gardner didn't "cause[] [B.H.] to engage in sex work"; instead "[B.H.] started and continued her sex work independently." *Id.* at 22. As Gardner sees it, the "all-important question [is] which came first, [B.H.'s] relationship with Mr. Gardner or her decision to engage in sex work." *Id.* at 27.

Gardner's argument misunderstands the statutory scheme and our caselaw. As relevant here, § 1591(a)(1) punishes anyone who, "in or affecting interstate or foreign commerce," knowingly:

recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person . . . knowing, or . . . in reckless disregard of the fact, that means of force, threats of force, fraud, coercion . . . or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act.

So to obtain a conviction under § 1591(a)(1), the government had to prove that, during the period covered by the indictment, Gardner:

(1) "in or affecting interstate or foreign commerce,"

(2) knowingly engaged in an act of trafficking—that is, "recruit[ing], entic[ing], harbor[ing], transport[ing], provid[ing], obtain[ing], advertis[ing], maintain[ing], patroniz[ing], or solicit[ing]" B.H.,

(3) with the knowledge *either* that "force, threats of force, fraud, [or] coercion . . . w[ould] be used to cause" her "to engage in a commercial sex act," *or* that B.H. was under 18 and would "be caused to engage in a commercial sex act."

In other words, "§ 1591(a) criminalizes the sex trafficking of children (less than 18 years old) with or without any force, fraud, or coercion, and it also criminalizes the sex trafficking of adults (18 or older), but only if done by force, fraud, or coercion." *United States v. Afyare*, 632 F. App'x 272, 279 (6th Cir. 2016). Gardner's indictment alleged both theories of liability, and the jury found Gardner guilty of each.

*Sex trafficking of a minor.* To establish the sex trafficking of a minor charge, the government needed to show that Gardner trafficked B.H. knowing, or recklessly disregarding, that she was under eighteen and "would be caused to engage in commercial sex acts." *United States v. Mack*, 808 F.3d 1074, 1081 (6th Cir. 2015). A minor cannot consent, so apparent consent by a minor is no defense. *Id.* (citing *United States v. Elbert*, 561 F.3d 771, 777 (8th Cir. 2009)). The parties do not dispute that Gardner knew B.H. was a minor; he admitted that on the stand. Therefore, so long as Gardner knowingly engaged in a trafficking act with respect to B.H. ("harbor[ing], transport[ing], provid[ing]," etc.), which he knew would facilitate her participation in a commercial sex act, he is guilty. As detailed above, the government introduced plenty of evidence, independent of any advertisements, that Gardner did just that. It would make no difference to this charge whether B.H. had previously advertised for, or willingly engaged in,

prostitution. And a lawyer does not commit ineffective assistance by failing to introduce irrelevant evidence. *See Millender v. Adams*, 376 F.3d 520, 527 (6th Cir. 2004); *see also Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001) ("[B]y definition, . . . counsel cannot be ineffective for a failure to raise an issue that lacks merit."). Accordingly, Gardner's counsel was not ineffective for failing to introduce the August Backpage ads to disprove Gardner's responsibility for trafficking a minor.

*Sex trafficking through force, threats, fraud, or coercion.* To establish causation on the other sex trafficking theory, the government had to prove that Gardner knowingly engaged in a trafficking act knowing that force, threats of force, fraud, or coercion "w[ould] be used to cause" B.H. "to engage in a commercial sex act." 18 U.S.C. § 1591(a)(1); *United States v. Aldridge*, 98 F.4th 787, 794 (6th Cir. 2024) (quoting *Mack*, 808 F.3d at 1080). Just one incident will do. *See United States v. Lacy*, 904 F.3d 889, 896 (10th Cir. 2018) (upholding a conviction under § 1591(a)(1) based on one coerced commercial sex act). The government's case was that, after becoming involved in B.H.'s sex work, Gardner would threaten her into going on "dates" on days when she did not feel like it. B.H. testified at trial that Gardner beat her several times a week and that she feared abuse if she refused to go on "dates." And, contrary to Gardner's reading of the statute, the jury could convict upon finding that Gardner used force or threats to get B.H. to go on particular "dates"—it did not need to find that Gardner forced B.H. to begin prostitution in the first place. *See United States v. Roy*, 781 F.3d 416, 420 (8th Cir. 2015) ("At issue [in a § 1591(a)(1) case] is not recruiting an individual to engage in commercial sex for the first time, but . . . [using] force, threats, fraud, or coercion to cause the victim to engage in commercial sex.").

The August Backpage ads could not have been used to "negate[]" this theory of causation. Appellant Br. at 27. Our caselaw holds that, in sex trafficking cases under § 1591(a), Federal Rule of Evidence 412 bars the use of prior acts of willing prostitution, unrelated to the defendant, to raise the inference that a defendant's use of force or threats "did not coerce" (or cause) a victim to engage in commercial sex acts on another occasion. *Mack*, 808 F.3d at 1084; *see also United States v. Bixler*, No. 21-5194, 2022 WL 247740, at *4 (6th Cir. Jan. 27, 2022). So ads showing that B.H. voluntarily prostituted herself before reuniting with Gardner would not

have been admissible to refute the government's case that Gardner, on "particular occasions," forced or coerced B.H. to go on "dates" with clients. *Bixler*, 2022 WL 247740, at \*4.

Indeed, the district court relied on Rule 412 in a pretrial ruling to exclude evidence of B.H.'s "other acts of prostitution unrelated to [Gardner], before or after the dates alleged in the indictment"—August 1, 2015, through October 31, 2015. R. 71 *In Limine* Op. & Order, PageID 669. Because the August Backpage ads were created between August 18 and August 22, the district court's *in limine* ruling technically did not cover them. But both parties agree that Gardner did not reconnect with B.H. until August 27. So the logic of the district court's order still applies—the August Backpage ads constitute "evidence that [B.H.] engaged in other acts of prostitution unrelated to" and prior to her involvement with Gardner. *Id.* Accordingly, had Gardner's lawyer attempted to introduce the Backpage ads as substantive evidence that B.H. had not "be[en] caused" to engage in prostitution, *see* 18 U.S.C. § 1591(a), the district court would have correctly excluded the ads under Rule 412. A lawyer does not commit ineffective assistance by failing to introduce inadmissible evidence. *Hodge v. Haeberlin*, 579 F.3d 627, 644 (6th Cir. 2009). So Gardner's counsel was not ineffective for failing to introduce the August Backpage ads to disprove Gardner's use of force or threats.

2.

Gardner next argues that his trial counsel's performance was deficient for failing to cross-examine B.H. using the August Backpage ads. Though Rule 412 prohibited counsel from introducing the ads as substantive evidence, "not all evidence implicating a victim's past sexual activity falls within Rule 412(a)." *United States v. Kettles*, 970 F.3d 637, 642 (6th Cir. 2020). In *Kettles*, for example, we held that Rule 412 did not forbid the defendant from "impeach[ing] [the victim's] credibility by showing that she had been untruthful regarding past allegations of sexual assault." *Id.* at 643; *see also United States v. Willoughby*, 742 F.3d 229, 234 (6th Cir. 2014).

Gardner says his counsel should have used the ads to impeach three statements that B.H. made on cross-examination. First, Gardner says that the Backpage ads "would have flatly contradicted" B.H.'s testimony that "[w]hen [she] got together with Michael in the summer of 201[5] [she] started doing prostitution," but "not right away." Appellant Br. at 14; R. 106 Trial

Tr., PageID 1451. Second, he says that the ads would have contradicted B.H.'s suggestion that her prostitution was "[e]ntirely Michael's idea." R. 106 Trial Tr., PageID 1451. And third, the ads would have contradicted B.H.'s testimony that she "never put the ads on Backpage" and that it "was Michael that was doing it." *Id.* at 1454. Gardner says that, because B.H. was the government's central witness, there is a reasonable probability that these hits to B.H.'s credibility would have caused the jury to acquit him of all charges. We disagree.

First, it is not clear that B.H.'s testimony would have been contradicted by the August Backpage ads, even assuming that B.H. posted them independently. The relevant exchange with defense counsel appears below:

> Q. When you got together with Michael in the summer of 2016 [sic], you started doing prostitution?
>
> A. Yes, but not right away.
>
> Q. It was after a while?
>
> A. Yeah.
>
> Q. And it was Michael that got you to do this, it was not your idea?
>
> A. Right. It wasn't my idea to just start doing it again.
>
> Q. Entirely Michael's idea?
>
> A. Right.
>
> Q. And when you started doing this, did you immediately start with the idea that we know you were using in October that year, that is, to use Backpage?
>
> A. Okay. Wait. Can you repeat that question, please?
>
> Q. Sure I can. When you first started out in the summer of 2015 to do prostitution, because Michael was telling you to, did you start out by putting ads on Backpage?
>
> A. Yes, that's where he—

R. 106 Trial Tr., PageID 1451–52.

The prosecutor then asked for a sidebar, seeking clarification of the timeline. The prosecutor was concerned that defense counsel might be interpreting B.H.'s answers as referring to "when she started prostituting completely" and that counsel would "then try to impeach her by saying she prostituted before." *Id.* at 1452. As the district court's pretrial order already had

established, counsel could not inquire about B.H.'s prior prostitution for substantive purposes. So, during the sidebar, the court reminded Gardner's counsel to "stay within the bounds"—that is, to limit his questioning to when B.H. "started doing [prostitution] with the defendant." *Id.* at 1453. Defense counsel assured the court that he was asking only about the time after B.H. "started [prostituting] with [the] defendant." *Id*. at 1452. And then he clarified that time frame for B.H.:

> Q. Okay. [B.H.], I'm sorry for that interruption. I want to make sure I'm perfectly clear with you, because you may have had trouble with the way I asked that question and I don't want to confuse you.
>
> A. That's fine.
>
> Q. We're in the summer of 2015. You've re-met. Michael at first everything is fine, as far as your testimony is concerned, then Michael started you doing prostitution, that's your testimony?
>
> A. Yes.
>
> Q. When Michael started you doing prostitution, did you start out putting ads on Backpage?
>
> A. Yes. He did start off putting ads on Backpage.
>
> Q. All right. You corrected me in a way to say, yes, he started putting ads on Backpage, not you started putting ads on Backpage?
>
> A. Yes.
>
> Q. Because you never put the ads on Backpage?
>
> A. Right.
>
> Q. It was Michael that was doing it?
>
> A. Yes.
>
> Q. Michael was making up the text. In other words, what goes on there, the name, what you do, and stuff of that nature?
>
> A. Correct.

*Id.* at 1453–54.

Given that defense counsel, consistent with the court's order, asked B.H. only about the time *after* August 27, when she "got together with" Gardner, it's unlikely that B.H.'s testimony could have been impeached by the August Backpage ads. *Id.* at 1451. B.H. did not testify, as Gardner suggests, that her entire history of "sex work was all . . . Gardner's idea." Appellant Br.

at 15. Instead, she testified that, measured from the time when she and Gardner reconnected, she "started doing prostitution," but "not right away." R. 106 Trial Tr., PageID 1451. She testified that, in that time frame, Gardner "got [her] to do [it]." *Id.* And she added that "[i]t wasn't [her] idea to just start doing it *again*," thereby admitting that she had engaged in prostitution before. *Id.* (emphasis added). She also testified that, after she and Gardner reconnected, "[w]hen Michael started [her] doing prostitution," he was the one who put the ads on Backpage. *Id.* at 1454. B.H. did not testify that she had "never" put *any* ads on Backpage, only that she had "never" put *the* ads on Backpage that were the subject of the exchange. That B.H. may have created her own Backpage ads before she reconnected with Gardner does not show that any of this testimony is false, so it's not clear how defense counsel could have used these ads to suggest to the jury that B.H. was lying.

Perhaps the August Backpage ads would have had some impeachment value if, for example, they had been substantially similar to those B.H. later claimed Gardner had composed and posted. But the district court found that the language and "content of these advertisements is quite different from the later ones listing [Gardner's] phone number as the number to contact." R. 130 Dct. Ct. Op. & Order, PageID 2399. The August Backpage ads do not contradict B.H.'s testimony, which, consistent with Rule 412, was focused on the time after she reconnected with Gardner. *See Mack*, 808 F.3d at 1084. As a result, counsel was not deficient for failing to confront B.H. with them.

B.

We next consider whether Gardner is entitled to an evidentiary hearing. We review a district court's denial of an evidentiary hearing in a habeas petition for abuse of discretion. *Witham v. United States*, 355 F.3d 501, 504 (6th Cir. 2004).

An "evidentiary hearing is required to determine the truth" of a petitioner's claims "[w]hen a factual dispute arises in a § 2255 proceeding." *Ray v. United States*, 721 F.3d 758, 761 (6th Cir. 2013) (quotation marks and citation omitted). But "bare conclusions or assertions of innocence" do not warrant an evidentiary hearing. *Wallace v. United States*, 43 F.4th 595, 607 (6th Cir. 2022) (quotation marks and citation omitted). To establish a need for a hearing, the

dispute "must concern a legally important fact." *Carson v. United States*, 88 F.4th 633, 642 (6th Cir. 2023) (quotation marks and citation omitted). If a favorable finding for the petitioner would still not warrant relief, the court need not conduct a hearing. *Id.*; *see also* 28 U.S.C. § 2255.

Gardner argues that he is entitled to an evidentiary hearing for several reasons. First, he wishes to question his trial counsel so that he can understand why counsel did not impeach B.H. with the Backpage ads. But we are unconvinced of the impeachment value of these ads. So there is no need to explore counsel's reasoning; regardless of the evidentiary hearing's finding, Gardner would be "entitled to no relief." 28 U.S.C. § 2255(b).

Gardner next seeks an evidentiary hearing to clarify "some uncertainty as to the specifics of the evidence" available during discovery and admitted at trial. Appellant Br. at 41. What specifics he seeks to determine, we do not know. Gardner points to no dispute of fact—let alone a legally material one. This "[b]ald assertion[] . . . do[es] not provide sufficient ground . . . to require an evidentiary hearing." *Thomas v. United States*, 849 F.3d 669, 681 (6th Cir. 2017).

Finally, Gardner requests an evidentiary hearing to obtain his phone's data. But this request is, in effect, a request for discovery pursuant to Rule 6(a) of the Rules Governing § 2255 Proceedings. *See id.* at 680. The certificate of appealability did not authorize an appeal of any discovery request, so we do not entertain Gardner's appeal of that issue here.

* * *

Gardner's counsel did not commit ineffective assistance by failing to introduce the August Backpage ads and confront B.H. with them. And Gardner offers only conclusory statements as to why he otherwise deserves an evidentiary hearing. The district court did not err by denying Gardner an evidentiary hearing or by denying his § 2255 petition. We AFFIRM.